[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-14316
_____

D.C. Docket No. 3:09-cv-10048-WGY-JBT

JAMES SMITH, SR.,

Plaintiff-Appellee,

versus

R.J. REYNOLDS TOBACCO COMPANY, et al.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(January 25, 2018)

Before MARTIN, JULIE CARNES, and ANDERSON, Circuit Judges.

JULIE CARNES:

This is an *Engle* progeny case[1] brought by plaintiff James Smith, Sr. against defendant R.J. Reynolds Tobacco Co. ("Defendant") to recover damages based on the death of his wife, Wanette Smith, from tobacco-related diseases caused by Mrs. Smith's decades-long history of smoking Defendant's cigarettes.  We face only one issue:[2]  whether the district court should have reduced the jury's compensatory damages award based on the degree of fault the jury attributed to Mrs. Smith.

## I.    Issues in This Appeal

In his wrongful death action, Smith asserted both intentional tort claims (fraudulent concealment and conspiracy to fraudulently conceal) and "non-intentional" tort claims (negligence and strict liability).  In a negligence action in which both parties have acted negligently, Florida law requires that the plaintiff's

---

[1]  "*Engle* progeny" cases arise from a Florida class action filed in 1994 against major tobacco companies, including Defendant, alleging that members of the class "were unable to stop smoking because they were addicted to nicotine and, as a result, developed medical problems ranging from cancer and heart disease to colds and sore throats."  *Liggett Grp. Inc. v. Engle*, 853 So. 2d 434, 440 (Fla. 3d DCA 2003), approved in part and quashed in part by *Engle v. Liggett Grp., Inc.*, 945 So. 2d 1246, 1263 (Fla. 2006).  The extensive history of this litigation need not be recited in detail here, as it is not pertinent to the only issue requiring our attention.  What matters for this case is that the Florida Supreme Court dissolved the class after the original jury made certain findings about tobacco and the defendants' conduct, granted those findings preclusive effect, and ordered that qualifying class members pursue their suits against the defendants in individual, "progeny" actions.  *Engle*, 945 So. 2d at 1276–77; *see also Philip Morris USA, Inc. v. Douglas*, 110 So. 3d 419, 436 (Fla. 2013) (same).  This is one of those progeny cases.

[2]  In a short discussion in its opening brief, Defendant acknowledged that a due process challenge to use of the *Engle* findings in progeny case trials could not succeed, given this Court's decision in *Walker v. R.J. Reynolds Tobacco Co.,* 734 F.3d 1278 (11th Cir. 2013), but Defendant nonetheless indicated it wished to "preserve that argument."  Since briefing in this case, our Court has reexamined *Walker.  See Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169 (11th Cir. 2017) (en banc).  Defendant has not pursued a due process challenge in this case in the aftermath of *Graham* nor further addressed the issue. Neither do we.

2

damages be reduced proportionately to the plaintiff's own fault in causing his injuries. By its own terms, however, the Florida statute requiring such reduction is not applicable to an action based on an intentional tort.

The jury found for Smith on all claims—including the intentional tort claims—awarding him $600,000 in compensatory damages and $20,000 in punitive damages. Responding to the court's instruction that required it to gauge the degree of responsibility Mrs. Smith bore for her injuries, the jury assessed Mrs. Smith with 45% of the fault, laying the remaining 55% of blame on Defendant. Defendant argued that, given this jury finding, the compensatory damages should be reduced by 45%, resulting in a compensatory damages award of $330,000. The district court, however, agreed with Smith that because there were intentional tort claims on which Smith prevailed, Defendant was not entitled to a reduction of the compensatory damages award. Defendant contends that the district court misapplied Florida law.

Second, even if Florida's comparative negligence statute disallows a reduction of the jury's compensatory damages figure based on Smith's comparative fault, Defendant contends that Smith nonetheless forfeited his ability to insist on adherence to Florida law because Smith suggested to the jury that any award they made would be reduced based on his wife's own negligence. Defendant says that besides misleading the jury, Smith's insistence that his wife's

3

own fault should be something the jury considered in arriving at a decision on damages permitted Smith to bolster his own position and gain favor with the jury, notwithstanding his actual position before the court that there could be no reduction of damages if the jury found Defendant liable on the intentional tort claims. Moreover, Defendant complains, the district court instructed the jury that it would reduce the award based on the jury's finding of any fault on Mrs. Smith's part, but then reversed course after the verdict and ignored its own instruction. In essence, Defendant argues that, combined with Smith's disingenuous argument, the court's instruction likely impacted the jury's calculation of the compensatory damages award. Defendant contends that the court should have kept its word and reduced the damages award, as it told the jury it would do.

As to Defendant's first argument, the Florida Supreme Court has recently resolved an intermediate appellate court split and ruled Smith's way: when a complaint in an *Engle* case contains both negligence and intentional tort claims, a plaintiff's success on an intentional tort claim—no matter whether the action in its entirety could arguably be characterized as a negligence action—defeats a defendant's claim to reduction of a compensatory damages award based on the plaintiff's degree of fault.

As to the district court's misleading instruction to the jury, that instruction was in fact incorrect. But because it was Defendant who requested this

4

instruction—not Smith, who requested an instruction that would have more accurately explained to the jury the possibility that its proportional assessment might have no effect on the damages award—Defendant cannot now complain. And as to Smith's concession to the jury that it should consider Mrs. Smith's own fault and attribute an appropriate percentage of responsibility to her—which also happened to be Defendant's argument—we conclude that Smith's argument was consistent with the very instruction that Defendant had requested. We find no waiver by Smith. Accordingly, we affirm the district court's decision not to reduce the compensatory damages award. We explain.

## II.    Trial Proceedings Giving Rise to the Alleged Error

Per his complaint, Smith envisioned that comparative negligence by his deceased wife would be an appropriate matter for the jury to determine. Although the parties do not focus on the evidence at trial on this subject, it is clear from a review of the closing arguments that evidence was elicited concerning Mrs. Smith's own responsibility for her injuries. What is important in understanding the present issues is the position each party took as to the appropriate instructions to give the jury on this matter.

The first thing worth noting is that neither party requested the instructions one might expect if one assumes that a plaintiff typically seeks to obtain the highest possible award for compensatory damages from the jury and that a

5

defendant aims for the lowest award.  That is, underlying Defendant's arguments here is the fear that, in trying to decide something as subjective as the monetary value of a given person's life, if a jury is told that the monetary value it sets will be reduced by whatever percentage of responsibility it assigns to the plaintiff, the jury may tend to go higher in pegging that life's value than it might otherwise find warranted because the jury knows that this valuation is not the number that will ultimately control.  So—particularly when it is uncertain whether the trial court will actually be permitted to reduce a damages award based on a jury's finding of comparative fault—it follows that a defendant would likely want the jury informed that its percentage reduction might never be applied so that the jury will understand the significance of the number it assigns to the value of the plaintiff's life and will not go higher than what it actually thinks that value to be, which a defendant would fear the jury otherwise might do if it expects that its award will be reduced by the percentage it has designated.  Likewise, under the same circumstances, a plaintiff might well prefer that the jury believe the value it ascribes to the decedent's life will definitely be reduced by the percentage of fault ascribed to the latter:  hoping that the jury may well go higher on its valuation assessment than it would were there no possibility of a reduction based on the decedent's fault.

Yet, in this case—for reasons perhaps understandable on Plaintiff's part but less so on Defendant's part—the parties played against type, going the opposite

6

direction than that indicated above.  Specifically, in his first proposed instruction, Smith requested that the court reveal to the jury that allocating a percentage of fault to Mrs. Smith would not necessarily mean that the compensatory damages would be reduced.  Smith indicated that instructions in other *Engle* cases had been more cryptic on this matter and that "to reflect Florida law and to avoid any confusion, [Smith's] Proposed Instructions and Verdict Form do not state that damages for all claims will be reduced by the percentage of fault on the decedent . . ."  Instead, Smith recommended that the following instruction should be given:

> Allocating a percentage of fault to [decedent's name] will only reduce the amount of the recovery on some claims.  Under the law, some claims are subject to reduction due to the fault of the claimant and others are not.  In other words, if you find that [decedent's name] was, for example, 50% responsible for [his/her] own death, you would fill in that percentage as your finding on the verdict form.  The Court will enter a judgment based on your verdict and on entering judgment will make any reduction required by law to reduce the damages by the percentage of fault that you find is chargeable to [decedent's name].

Defendant's proposed instructions, however, were silent as to any possibility that the percentage of fault attributed to Mrs. Smith would not automatically result in a reduction of the compensatory damages.

Thereafter, the district court directed the parties to submit a different set of proposed instructions that more closely complied with the standard instructions given in another federal *Engle* case.  Smith and Defendant jointly presented a set of instructions that had been used in two previous federal *Engle* progeny cases, with

7

any objections listed.  As to the instruction on comparative fault, the prior-case instructions included no warning to the jury that its calculation of Mrs. Smith's fault might not actually impact the recovery.  Given that omission, Smith sought to add language that he believed would so alert the jury.  Smith explained:

> This language clarifies that comparative fault does not apply to intentional torts. . . . The instructions given in *Pickett* and *Walker*, however, did not make it clear that if the jury found liability for fraud or conspiracy, damages would not be reduced by the portion of fault attributable to the decedent.  Thus to reflect Florida law and to avoid any confusion, this language modeled after instructions used in state court *Engle* progeny litigation is necessary and appropriate.

Yet, consistent with its legal contention that a comparative negligence finding by the jury does automatically result in a proportionate reduction of compensatory damages on all claims, Defendant objected to language intended to alert the jury that a reduction based on its finding of relative fault would not necessarily apply to all claims, because "it is nonstandard, misleading and confusing to the jury, contrary to Florida law, and an unjustified departure from the instructions given in federal *Engle* progeny trials to date."

During the instruction conference with the district court, Smith explained his concern if the court instructed the jury that the court would reduce the damages to the extent the jury found Mrs. Smith to have been at fault.  Smith made clear his position that the comparative fault statute applying to negligence claims does not apply if the jury also finds for a plaintiff on an intentional tort claim.  Yet,

8

Defendant's proposed instruction offered no such caveat.  Smith expressed his concern that, if given as written, Defendant would later argue that Smith had waived his right to argue that the damages should not be reduced upon a finding of liability on the intentional tort claims.

Indicating disagreement that a reduction of damages would be precluded based on a finding of its liability on an intentional tort, Defendant objected to an instruction that alerted the jury that its compensatory damages' calculation might not be reduced based on the decedent's own negligence.  Defendant assured the court and Smith that Defendant would not later argue waiver simply because Smith did not object to Defendant's requested instruction.  Having trouble understanding any further concern by Smith on this subject, the district court opined that "if the law is that there's no comparative negligence in an intentional tort, then we don't apply percentage of fault."  Smith explained that in other cases in which the jury has been instructed that damages will be reduced based upon a finding of fault by the plaintiff, Defendant had argued that such a reduction must occur, even if an intentional tort was found.  "And that's what I'm trying to protect against."  The district court inquired whether Smith sought a stipulation against such an argument.  Defendant responded, "By the fact that they have objected to this, we are no longer in a position and would not anyhow argue that by the giving of this instruction they are somehow precluded from arguing their view of the

9

comparative fault statute." And both the court and the parties indicated that this concluded the matter.

The court then instructed the jury pursuant to the instruction requested by Defendant: "Allocating a percentage of fault to Mrs. Smith will . . . reduce the amount of Mr. Smith's recovery . . . . [T]he Court will prepare the judgment to be entered and will reduce Mr. Smith's total damages by the percentage that you insert." The jury found Defendant liable on the intentional torts, but also found that Mrs. Smith was 45% responsible for her injuries. After the verdict, Defendant requested that the court reduce the compensatory damages proportionately with Mrs. Smith's own fault, "as in almost all of the trials where this issue has arisen." As Smith had always indicated he would do, Smith objected to any reduction, given the jury's finding of liability on the intentional tort claims. Yet, contrary to Defendant's representation at trial that Smith would not be precluded from advocating his interpretation of the comparative fault statute should the jury find Defendant liable on an intentional tort, that is exactly the argument Defendant made. Defendant contended that by arguing that the jury should consider apportionment and by presenting a verdict form that did not alert the jury that its assessment of comparative fault would not be applied if liability was based on both negligence and intentional torts, Smith had thereby waived any objection to the application of comparative fault to all claims found by the jury.

10

The district court heard oral argument on the matter, focusing first on the legal question whether the comparative negligence statute should even apply in a situation such as this. Learning that Florida courts were not consistent in how they had handled the issue, the court noted that "there's a great deal of intuitive appeal about the defendant's position" in that while Defendant's concealment was an intentional tort, Mrs. Smith herself had made an intentional decision to continue to smoke: acts that could be compared. But ultimately, without guidance from Florida appellate courts, the district court interpreted the statute as disallowing any reduction based on the negligence of the plaintiff when the jury had also found a defendant liable for an intentional tort.

Turning next to the question whether Smith had waived the right to argue that a reduction of damages was prohibited by the statute, Defendant contended that, by acknowledging to the jury its responsibility to apportion fault, Smith could not, post-verdict, switch gears and argue that fault should not be apportioned. Moreover, Defendant noted the unfairness of allowing a plaintiff to gain credibility with a jury by conceding his own fault and telling the jury that it should consider that fault, when all the while the plaintiff knows that this acceptance of responsibility is a sham because any reckoning of that fault by the jury will not be implemented in the final judgment.

11

The court expressed sympathy for Defendant's position: "I couldn't agree with you more. It probably does have an influence, and I think the plaintiffs are wise to take that approach." Nevertheless, recalling Defendant's assurance during the instruction colloquy that Smith would not be deemed to have waived his right to argue against a reduction of damages, the district court was unpersuaded by Defendant's contrary post-verdict argument. Thereafter, the district court entered a written order consistent with its oral conclusions expressed at the hearing, and it let Smith's $600,000 compensatory damages verdict stand, unreduced by the 45% responsibility the jury had assigned to Mrs. Smith.

## III.    Florida Law Governing Comparative Fault

We review *de novo* a district court's interpretation of a state law. *McMahan v. Toto*, 311 F.3d 1077, 1081 (11th Cir. 2002). Florida Statute § 768.81 provides for a reduction of damages in a negligence action for a plaintiff who has herself acted negligently, in proportion to the plaintiff's degree of fault. Specifically, "[i]n a negligence action, contributory fault chargeable to the claimant diminishes proportionately the amount awarded as economic and noneconomic damages for an injury attributable to the claimant's contributory fault, but does not bar recovery." Fla. Stat. § 768.81(2) (2011). The statute provides that a "[n]egligence action" means "without limitation, a civil action for damages based upon a theory of negligence, strict liability, products liability, professional malpractice . . . or

12

breach of warranty and like theories." *Id.* § 768.81(1)(c). A "'[p]roducts liability action' means a civil action based upon a theory of strict liability, negligence, breach of warranty, nuisance, or similar theories for damages caused by the manufacture, construction, design, formulation, installation, preparation, or assembly of a product." *Id.* § 768.81(1)(d). On the other hand, "This section does not apply . . . to any action based upon an intentional tort." *Id.* § 768.81(4). Finally, "[t]he substance of an action, not the conclusory terms used by a party," determines whether an action is a negligence action or a products liability action. *Id.* § 768.81(1)(c) and (d).

It had been Defendant's position, during trial and on appeal, that Smith's action, at its heart, was a products liability and negligence action—not an intentional torts action—notwithstanding the existence of claims based on intentional and fraudulent concealment. Florida intermediate courts of appeal had been split on the question whether an *Engle* progeny action that contains both negligence/strict liability claims and intentional tort claims can nevertheless be deemed a negligence/products liability action for purposes of qualifying for reduction of damages based on the plaintiff's own negligence.

But there is no point recounting the different arguments each side has mustered because the Florida Supreme Court, very recently, resolved the issue decisively. That court held that when an *Engle* progeny case contains both

13

negligence and intentional tort claims and when the jury has found for the plaintiff on an intentional tort claim, then the compensatory damages award cannot be reduced based on the plaintiff's percentage of fault, unless the plaintiff waived the intentional tort exception. *Schoeff v. R.J. Reynolds Tobacco Co.*, 2017 WL 6379591, at \*7, ___ So. 3d ___ (Fla. Dec. 14, 2017). Given the Florida Supreme Court's holding, Defendant's interpretation of this Florida statute cannot prevail. Therefore, the district court properly interpreted Florida law in ultimately deciding that, pursuant to that law, Smith's damages could not be reduced, even though the jury found Mrs. Smith to be 45% at fault for her injuries.

## IV.    Whether Smith's Trial Conduct or the District Court's Failure to Follow Its Own Instruction Regarding Reduction of Compensatory Damages Entitles Defendant to a Reduction of Those Damages

The Florida Supreme Court having decided that Defendant's interpretation of the Florida law on this point is wrong, Defendant is left with two arguments for nonetheless reducing the compensatory damages based on plaintiff's own contributory negligence: (1) Smith's conduct in arguing to the jury that it would be able to reduce his compensatory damages based on his wife's own contributory negligence now estops him from taking a different position and (2) having instructed the jury that it would reduce the damages by the percentage of responsibility the jury assigned to Mrs. Smith for her injuries, the district court was bound to comply with its own ruling.

14

A.    Smith's Conduct At Trial

Defendant contends that Smith waived his right to non-apportioned damages due to his use of Mrs. Smith's comparative fault as a litigation tactic.  That is, Defendant avers that Smith disingenuously argued to the jury that it should take his wife's own negligence into account in awarding damages, when, in fact, his true position was that upon a finding by the jury of liability on the intentional tort claims, the jury's finding of partial responsibility on Mrs. Smith's part would be a futile decision with no consequences.  The district court found no waiver.

We review the district court's application of waiver for abuse of discretion. *Proctor v. Fluor Enter., Inc.*, 494 F.3d 1337, 1351 (11th Cir. 2007). "Waiver is the voluntary, intentional relinquishment of a known right."  *Glass v. United of Omaha Life Ins. Co.*, 33 F.3d 1341, 1347 (11th Cir. 1994); *Wood v. Milyard*, 566 U.S. 463, 470 n.4 (2012) ("A waived claim or defense is one that a party has knowingly and intelligently relinquished . . . .").  "In diversity of citizenship actions, state law defines the nature of defenses, but the Federal Rules of Civil Procedure provide the manner and time in which defenses are raised and when waiver occurs."  *Morgan Guar. Trust Co. of New York v. Blum*, 649 F.2d

342, 344 (5th Cir. Unit B 1981).[3]  Along with the intent of the party against which waiver is asserted, "the reality of notice and the reality of prejudice in fact must be considered."  *Proctor*, 494 F.3d at 1352.  The party asserting waiver bears the burden of proof.  *See Glass*, 33 F.3d at 1348.

Defendant argues that state law governs the substantive standards used to determine whether Smith waived his right to contest the apportionment of damages based on his wife's fault; Smith argues that federal law applies.  At the time that Defendant argued that state law authority controlled, there was Florida authority favoring its position.  Since that time, however, the Florida Supreme Court has issued an opinion that greatly undermines Defendant's reliance on Florida law for its waiver argument.

As noted, the Florida Supreme Court recently decided that the Florida comparative fault statute does not apply to reduce a plaintiff's damages on a negligence claim when the jury has also found liability based on an intentional tort.  *See Schoeff*, 2017 WL 6379591, at *7.  The Florida Supreme Court nevertheless held open the possibility that a plaintiff could waive the intentional tort exception.  *Id.* ("Because the jury found for Mrs. Schoeff on the intentional tort claims in this case, her compensatory award may not be reduced unless she waived the

---

[3]  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

intentional tort exception.")  The court noted that three different Florida intermediate appellate courts (district courts) had found that a plaintiff could waive the intentional tort exception under certain circumstances. The court noted that one of those district courts—the First District—found that the trial court did not abuse its discretion in finding waiver where the plaintiff had assured the jury throughout trial that her deceased spouse was partially at fault for his illness, where the court had instructed the jury that it would reduce the compensatory damages by whatever percentage of fault it attributed to the smoker, and where the plaintiff never informed the jury of the potential inapplicability of the comparative fault statute.  *Id.* at \*8 (citing to *R.J. Reynolds Tobacco Co. v. Hiott*, 129 So. 3d 475 (Fla. 1st DCA 2014)).  The Florida Supreme Court further noted that the same district court found no waiver in a case containing different facts.  In that case, *R.J. Reynolds Tobacco Co. v. Sury,* 118 So. 3d 849 (Fla. 1st DCA 2013), the plaintiff had made clear in its complaint that fault should not be apportioned on intentional torts,  the plaintiff had never argued to the jury or court that his damages should be reduced by his portion of the fault, and the defendants had agreed to the verdict form.  *Schoeff*, *supra.*

The Florida Supreme Court found the case before it to be more similar to *Sury* than to *Hiott*.  *Id.*  It noted that, like the plaintiff in *Sury*, Schoeff's complaint made clear that she opposed apportionment of fault on the intentional tort counts.

17

Further, the verdict form in the *Schoeff* case listed the finding on the intentional tort claims after the question on the negligence claims and its accompanying question on apportionment of fault. *Id.* Finally, the defendants in *Schoeff* had agreed to the verdict form that was used.

Were that all the court stated, we might conclude that the Florida Supreme Court envisioned the possibility of waiver based on different facts. But, in the next paragraph, the court stated, with no explanation of its reasoning, that it disagreed:

> with the Fifth District in *Green* and the First District in *Hiott* to the extent they held that the intentional tort exception is waived when an *Engle* progeny plaintiff argues comparative fault on the negligence counts, and we reject the Fourth District majority's theory of waiver below. Based on the foregoing, we find that the trial court abused its discretion in finding that Mrs. Schoeff waived the intentional tort exception.

*Id.* Given the absence of explanation why it disagreed with the above intermediate Florida courts of appeal, it is unclear in what situations, if any, the Florida Supreme Court might find waiver to have occurred. But, at the least, one can fairly infer that the court is not keen on the notion of waiver in this context. And, as Defendant argues that state law controls, this is not a helpful inference.

As noted, Smith argues that federal law applies, albeit there appears to be no federal precedent on point. Even assuming that federal law would control, not *Schoeff*, we find no waiver here. We repeat: waiver is the voluntary, intentional relinquishment of a known right. It is difficult to conclude that a litigant who has

18

consistently proclaimed his opposition to apportionment of fault on an intentional tort claim has somehow waived his right to later maintain that position as to the entry of the judgment. This is particularly so when defense counsel indicated at trial that it would not later argue that Plaintiff had waived his right to oppose apportionment.

Defendant argues that its promise not to argue waiver was limited to the question of the now-problematic instruction given to the jury, to which, as we have explained, Smith actually objected. Instead, Defendant says, its waiver argument is based on the fact that Smith admitted to the jury that his wife bore some responsibility for her injuries, all the while knowing that Smith would object to any actual reduction should the jury find liability on the intentional tort. But what else was Smith to do? The question of comparative fault was before the jury, and he had to argue his position on that matter. And his position, actually, was to minimize as much as possible his wife's fault, which is what one would expect him to do. Had Smith affirmatively misled the jury as to the law in his summation— which he did not do—it was up to Defendant to object and for the court to correct any misrepresentation. There was no objection and no correction. It was not Smith's job to explain to the jury what would happen if they found Defendant liable on the intentional torts. It is the court that instructs the jury. And, as we have noted, Smith actually sought an instruction that would have informed the jury

19

that damages would not necessarily be reduced upon the jury's finding of negligence on Mrs. Smith's part.  Defendant, however, objected to that requested instruction, persuading the district court to give the problematic instruction that led to the jury confusion about which it now complains.  Finally, the verdict form here could clearly have been drafted in a way that minimized, or even eliminated, any jury confusion.  Defendant did not object to the verdict form that was given to the jury.

For these reasons, we conclude that Smith did not waive his right to insist that the Florida intentional tort exception be applied to prevent reduction of compensatory damages based on Mrs. Smith's degree of fault.

B.    Impact of Incorrect Instruction Given by District Court

Even if Smith did not waive his right to insist on application of the intentional tort exception, Defendant argues that reversible error occurred when the district court gave the jury an instruction that likely had an impact on their calculation of damages, only to abandon that instruction after the verdict.  Given the Florida Supreme Court's recent ruling in *Schoeff*, a jury's finding of liability on an intentional tort means that the compensatory damages award in an *Engle* case cannot be reduced even when the jury has found that the plaintiff's own fault contributed to her injuries.  For that reason, in assuring the jury that the damages

20

award would be reduced proportionally with the jury's finding of Mrs. Smith's own negligence, the district court clearly gave an incorrect instruction.

Yet Defendant finds itself in a weak position to challenge the instruction. Typically, a challenge to a jury instruction arises when the party complaining on appeal is either damaged by an instruction to which he has objected or when the court has refused to give an instruction that the complaining party has requested. Here, the district court did not refuse to give an instruction that Defendant requested or give an instruction to which Defendant objected. The court gave the exact instruction requested by Defendant.

But Defendant's argument here is more nuanced than merely complaining about a jury instruction. At the time that this case was tried, Florida law was unclear as to whether a finding of liability on an intentional tort would prevent a reduction of damages for a plaintiff who was found to be contributorily negligent. Defendant argues that, by deciding to give Defendant's proposed instruction—an instruction that we will assume could have had an impact on the jury's calculation of damages—the district court was obliged to follow through on that instruction. According to Defendant, even though the district court later changed its mind as to the correctness of that instruction, the court could not subsequently unring the bell it had tolled before the jury, and its renunciation of its earlier decision potentially prejudiced Defendant in terms of the damages awarded by the jury.

21

There is some facial appeal to Defendant's argument, as a general matter. Defendant's own conduct in this case, however, undermines what might otherwise be a problematic decision by the district court. In particular, it was very uncertain whether Defendant's interpretation of Florida law would ultimately win the day in the Florida court system. That being so, Smith took a prudent position, advocating for an instruction that would better protect Defendant regardless of how the Florida law issues might ultimately be decided. Smith wanted the jury to know that its attribution of fault to his wife would not necessarily result in a reduction of his damages. It was Defendant who aggressively sought an instruction that it knew could well impact the jury's calculation of damages in a way that would disfavor Defendant should Florida law not be interpreted the way it hoped. It is hard to understand why Defendant did so.

But even leaving aside Defendant's pivotal role in creating this problem, we will assume for purposes of this appeal that reversible error can potentially result when a district court, post-verdict, renounces an instruction it gave the jury and thereby prejudices the party at whose request the instruction was given. Nonetheless, Defendant's suggested remedy is not apt. In particular, Defendant asks that compensatory damages be reduced by the 45% of fault the jury imputed to Mrs. Smith, even though it is now clear that such a reduction does not comply with Florida law. But that would not be the correct remedy here even if we

22

accepted Defendant's argument.  On these specific facts, where it was Defendant who had prompted the incorrect instruction—rejecting an instruction that would have better protected it—Defendant would at most be entitled to a new trial on the question of damages.  Notably, Defendant never requested a new trial before the district court, nor has Defendant here requested remand for a new trial on the question of damages.[4]  The relief Defendant requests—a reduction of damages in violation of Florida law—is obviously not apt.[5]  Accordingly, we conclude on the facts of this case that the district court's repudiation of its own charge to the jury concerning the reduction of damages does not justify a reversal of its ultimate decision not to reduce those damages.

V.    **Conclusion**

For the above reasons, we **AFFIRM** the district court.

---

[4]  On appeal, Defendant has asked, should we reject its argument that compensatory damages must be reduced as a matter of law, that we remand to allow the district court to reassess its rejection of Defendant's waiver argument in light of two intermediate Florida appellate court decisions.  Those decisions having now been disavowed by the Florida Supreme Court, there would be no point to that remand.

[5]  And how unfair it would be to Smith to summarily reduce his damages based on an incorrect instruction requested by Defendant, instead of, at the least, giving Smith a second shot before a jury that was properly instructed.

23